Yes, so she is on a diet, not happy about it. Judges, it's 1051, so just let me know when you're ready. We're ready. Admitting them now. The Honorable Judges of the United States Court of Appeals for the Tenth Circuit. Welcome back. Our fourth case this morning is 20-1310, Albezlo v. Great Western Life. Mr. Wolfe, you're for the appellant. Yes, Your Honor. Thank you, Your Honor. May it please the court. If I may, I would like to reserve three minutes of my argument for rebuttal. The district court was supposed to determine whether the fees defendants charged on the mutual funds at issue in this appeal were within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances. The district court, however, ignored the circumstances that were specific to these funds. Instead, the court determined that because the fees of these funds were within the range of other mutual funds in the market generally, they were appropriate and defendants were not liable. The court based that decision on its belief that market competition constrains pricing based upon the theory of Dr. Glenn Hubbard, and therefore, what the market rates are for similar funds must be what would have been negotiated for the funds in this case. The Supreme Court in Jones v. Harris Associates, however, rejected just such a heavy reliance on the fees of other funds, noting that those fees, quote, may not be the product of negotiations conducted at arm's length, end quote. In fact, the Second Circuit in Gartenburg, which the Jones court affirmed as the proper standard states, quote, if rates charged by the many other advisors were an affirmative competitive criterion, there would be little purpose in Section 36B. That is exactly what Dr. Glenn Hubbard's theory was in the Seventh Circuit decision in Jones v. Harris. That's the theory of Dr. Hubbard and the only two publications he's ever published regarding mutual fund fees. What would you say the breakdown in the board's process was here? The breakdown of the board's process was that the board also didn't consider the factors specific to these funds, including the growth in assets over time, the growth in profit margins over time, the fact that the sub-advisors who were doing the actual investing of the funds were cutting their fees, but capital management was not doing that, and disregarding the fact that capital management's own calculation of what its top competitors in the Empower Retirement System were charging was the fee that it used for eight of its mutual funds, but not for the at-issue funds in this appeal, which were as large as or even larger than those eight funds. And when they were confronted with that fact at trial, what the directors did was fell back on competitive fees. They said, in fact, that third-party advisors, Lipper specifically, came in and told them that the fees are reasonable because they're within range. That's the kind of heavy reliance on fee comparisons that the Supreme Court explicitly rejected. Well, the Supreme Court didn't explicitly reject it. It said that you need to give it the weight to which it's entitled, that you can't rely on it to the exclusion of all of the other factors, and, you know, it looks to me like the court here went through all of those other factors. Well, it's not out as a factor, but it cannot be as heavily relied on as both the directors and the district court did in this case. And the whole concept that market competition constrains pricing and therefore sets reasonable fees, or could have been negotiated at arm's length, was the entire basis of the Seventh Circuit's decision in Jones. And that decision was vacated, and the Supreme Court in Jones specifically stated, that's a matter for Congress, not the courts. Section 36B is still on the books. The district court did not address the fact that for these funds, the profit margins are increasing even as assets are increasing, which is not proper because even Gartenberg points out, mutual fund advisors are supposed to be reducing their fees as assets increase, so that the profit margins aren't increasing at the same times as assets are increasing, exponentially boosting their profits. Well, I think that the district court, as I understand its opinion, found your expert not credible on this, in part because the expert didn't consider ways in which there were other methodologies by which the increase in profits were taken account of in terms of fees. Right. And as we point out in our brief, that was factually unfounded. Because if the advisor were sharing economies of scale, the profit margins wouldn't be increasing as assets increase, right? The expenses for these funds are expressed as a percentage of assets. So, if they're sharing the gains that they're earning from economies of scale or any other source, then the expenses as a share of assets should be either level or possibly going up. But in this case, the operating expenses as a percentage of assets are going down as assets increase, and that's boosting the profit margin to the advisor as the assets go up. So, increased profits isn't the issue, right? I mean, the standard that's been set by the Supreme Court, which is probably why these cases are generally not successful, is that you've got to show that this particular level of profits is completely outside bounds of what people at arm's length would have negotiated. And I think one of the problems that the district court had is there really wasn't any evidence of what those bounds were. Well, but Your Honor, that is incorrect. It is not a test of what is the proper profit margin. There's no red line for what's an appropriate profit margin or what's not an appropriate profit margin, although the directors were advised by their outside counsel that that level is 77%. But it's a fact that has to be considered. So Your Honor, if you're negotiating at arm's length, you see that the advisor's fee, which has been in place since 2010, when assets were under a billion dollars, is the same fee when assets are over $2 billion. The profit margins are going up as the assets are going up, so the profits are increasing exponentially, and the advisor's own calculation of what its competitors' fees are for these retirement plan mutual funds is only 12 basis points, and the advisor would be profitable at 12 basis points. And the advisor's using that same metric to set its fees on eight other mutual funds that are either the same size or smaller. They're all far smaller than the S&P 500 index fund. You challenge on profitability, you challenge the total expense ratio measurement. What's wrong with using that as an appropriate tool? What's wrong with it is that it takes into account compensation to individuals other than the advisor. So under the Investment Company Act, the investment advisor owes a fiduciary duty as to its compensation or the compensation of its affiliates, and a shareholder's entitled to sue for breach of fiduciary duty, the advisor and or the affiliates, and we did that in this case with capital management and life and annuity. Total expense ratio includes a lot of other items that are expenses for the mutual fund other than the advisor's compensation. So in a way of speaking, it's not comparing apples to oranges. And then the fee comparisons that they have, that bears out. So at one point, before the life and annuity administrative services fee was split out, that was all lumped in together with capital management's fee, and then that total for the S&P 500 index fund, 60 basis points, combining 25 for the advisor and 35 for life and annuity, was then compared to other mutual funds, including the other mutual funds, 12B1 fees and other fees that have nothing to do with capital management's compensation or life and annuity's compensation. And looking at that 60 figure doesn't tell you whether the 25 basis points that's going to the advisor or its services is compensation that is disproportionate to the services that that advisor provided. If you look at total expense ratio, you can't tell if the compensation to the advisor is disproportionate to the services that the advisor provided, because you're looking at services that a lot of other individuals are providing at the same time. So you're mixing in a lot of extraneous information. Well, as a matter of fact, well, I mean, I get that as a logical matter, but as a metric to try to determine whether the fees are beyond the bounds, why is there any authority that says that total expense ratio would not be one factor that you could consider? No, there's no authority that says that. There's very little authority in this area at the appellate level and higher. One thing that's noteworthy is that the Supreme Court in Jones nowhere mentions total expense ratios as the appropriate metric. But going back, I'm sorry, go ahead. Well, just your honor, all I would point out is that there are only six cases cited that defendants claim approved the use of total expense ratios, but only two of those cases actually discuss whether it's appropriate to use those total expense ratios. And only one of them, the Chill case, really talks about that's Dr. Hubbard's theory for how to do this and doesn't really explain how that comports with the language of the statute. Going back to Judge McHugh's point earlier, though, I mean, you look at the look at Jones and the language that it uses is that it has to be so disproportionately large that it bears no reasonable relationship to services rendered. Now, given the burden is on you, right, to establish that that is, in fact, the case, that's a very expansive view of what would be appropriate fees. And so what is it? What is what is the the key element? I mean, I know there are a bunch of factors that you would look at, but what key among the things here, what is most salient to you that that indicates to you that the advisors here meet that standard of liability? The S&P 500 index fund as an example, those fees were set well before 2010 when the fund was less than a billion dollars. By 2014, that fund was over two billion dollars and the fees remained the same. That's contrary to the principle expressed in Gartenberg that advisors are supposed to cut their fees as assets increase. And it was immensely profitable to capital management because even if it kept its profit margin at the same level, its profits would be going up in dollar terms as the assets increased. But because its expenses are dropping as assets increase, its profit margin is increasing at the same time, both in percentages and in dollar amounts. And under those factors, a fee that may have been reasonable back in 2010 at under a billion dollars can't be reasonable again in 2016 or 2015 or even 2014 when it's over two billion dollars. And that's predicated on economies of scale. Is that what you're getting at? It's predicated on growing profit margins. We can say that it's economies of scale or we can get into a debate over what exactly constitutes an economy of scale. But it's recognized by the SEC and Gartenberg essentially in saying that you drop your fees as assets increase. Yes, that's economies of scale. What's the magic number here? I mean, how do we how do we draw that line? There's no magic number, but it has to be it has to be considered and explained. The district court here did not even address the issue of the fact that the profit margins are going up. And this fee has been in place since 2010. And this fee is above the 10 basis point fee that the president of Great West himself says is what index funds charge. These are all but one of them are index funds. Great West's own president, Robert Reynolds, used to run Putnam Funds, mutual fund company, that index funds charge 10 basis points. I mean, that's even higher than the average of capital management's competitors among Empower retirement plans, which are 12 basis points. And even in the I think the problem in the record here is that you can point it and say it's greater than it was and that the profit margin has increased. But I don't see anywhere that you went beyond that and said and that meets the Jones standard of being so disproportionately large that it bears no reasonable relationship to the services rendered. Well, we do, because the fact that the profit margins are going up at the same time that assets are increasing shows that economies of scale aren't being shared. Here's another example for the S&P 500 index fund. Capital management hires its own affiliate as of 2016 to manage that fund. Capital management's not managing any of these funds and reduced its sub-advisors fees. Right. So it cut its expenses deliberately there. It didn't immediately share that with shareholders. It kept the profit itself. In the Templeton Global Bond Fund, the advisor, Franklin Advisors, had a fee schedule that reduced its fees as the fund hit $100 million and $200 million in assets. But capital management didn't do that. The retail version. Do we have to find the district court committed clear error here? As to its factual findings, the standard is clear error. But as to misapplication of law, it's a de novo issue. Are you alleging any clear errors of all the legal application to Jones and Gartenberg? It's predominantly the legal application of Jones and Gartenberg. But we point out a number of instances of clear errors and facts, including the basis for the courts finding that our expert was not credible, which again was in the court's section on damages, not on the facts of the case. And on the question of damages, the court's legal error there is saying that you only get the outer bounds of what the market rate is, not a calculation of what a reasonable fee would have been under the circumstances. All right, counsel. Thank you. Your time to start us here from Mr. Murphy. Your Honor, Sean Murphy for the defendants. May it please the court. Plaintiffs are attempting to undo the result of an 11 day trial. And to do that, they'll need to demonstrate that Judge Arguello was made reversible errors, both as to her judgments on liability and damages. And plaintiffs cannot prevail on this appeal unless they overturn both judgments. I'd like to address four main points today. One is the standard under Section 36B. Second, how Judge Arguello's decision is consistent with that standard and also consistent with the voluminous record at trial. Third, I'd like to address more globally some of the problems that plaintiffs face on this appeal. And by that, I just mean, given the nature of the judge's decision, many of  them. I mean, plaintiffs challenged dozens of factual findings under the Gartenberg factors, but this court would have to find clear error on many of them before you'd look at them collectively and say the result would be different. And fourth, I'd like to just briefly cover damages, which, as I said, is an independent grounds for affirmance. And I also think it's a very simple and straightforward issue in terms of a ground to affirm the trial court's decision. Starting with the standard, obviously, Jones v. Harris set the so disproportionate standard that we've been talking about. But I just want to make clear the statute uses the term fiduciary duty. Obviously, in this context of the statute and the investment company more broadly, the Supreme Court and Congress made clear that it's quite different from some of the fiduciary standards you'd see under ERISA or common law. Congress rejected reasonableness as the standard, expressly rejected, as Jones notes, and rejected rate regulation, noted that courts should not sit as rate regulators. And lastly, I'd say about the standard is the important role that the independent board of directors plays in approving the fees each year. Obviously, if they have a robust process, the court should give that decision to approve the fees substantial deference. Plaintiffs have a heavy burden. I don't think there's much dispute about that. And as Judge McHugh noted, you know, no plaintiff in 50 years since the statute is inactive, no plaintiff, despite many tries, has been successful in improving a violation of 36B. Well, there's always a first time. And so let's talk about the counsel's points as one salient indicator that the Jones standard is met. The S&P 500 and the fact that the assets grew dramatically and so did the profit margins. Why isn't that an indicator of a problem in terms of disproportionately high fees? So, Your Honor, what I'd say is there's two parts to that. One is profitability, which is a Gartenberg factor, and one is economies of scale. I don't think the profit margin is, meets a level where plaintiffs would meet their burden of proof, whether you look at defendant's profit margins or plaintiff's profit margins. I think defendants, the highest profit margin of any fund was 70 percent, and the plaintiff's experts said the highest profit margin was 56 percent. So the profitability of the fund does not support a violation of 36B under that factor. In terms of economies of scale, the plaintiffs are simply saying the profitability grew. The court was presented with evidence, which is cited in her proposed findings that she adopted, that showed that the advisor had taken the five largest funds in the complex, including the S&P 500, and showed that profit margins were relatively stable over a five-year period from, you know, 2012 to 2017. Plaintiffs' profit margins are the ones that they're suggesting the court should look at that the court rejected. They're looking at the profitability of individual share classes, which I think the court used S&P 500 as an example and said that accounted for like 30 percent of the assets. It's not the profitability of the fund, it's the profitability of some subset of it. But the other thing I would note is profit margins have been widely held not to be dispositive of economies of scale, as plaintiffs are suggesting. Profits can go up and down for reasons other than scale, and they're ignoring, the plaintiffs are ignoring sharing through ways other than fees, lowering fees, such as reinvestments in services. And there was a lot of testimony, again, cited by the trial court showing that the advisor was sharing economies of scale in other ways, making investments that economies of scale and profitability, and say, therefore, economies of scale are not being shared. But if I drop all of that, Your Honor, I'm back to my point about, you know, if they had a showing under economies of scale, which I think they failed, you're left with one factor and there are five other factors, including most importantly, the board. The other thing I'd note about the S&P 500 fund is those fees were cut during the relevant time period. There were waivers on that fund where fees were reduced during the relevant time period. Plaintiffs, you know, they sued on three years, 2015, 2016 and 2017, and the fees were reduced in 2016. So I think there was a lower fee towards the end of the relevant time period. And by board, as being an important factor, you're focused on the rigorousness of the fee for the advisors. Is that what you mean? Yeah, I mean, I think that would be one of the most important things I would note, Your Honor, is I think that's the most important factor. As Joan says, 36B has two elements, procedure and substance. And if you look at what the judge found, she spent a lot of time assessing the board and had findings on the board across a range of factors, some of which the plaintiffs don't challenge. You know, they do not challenge, for example, that the board was independent. They do not challenge that the board was qualified. And there are a number of findings as to their diligence and other aspects of their process that the plaintiffs don't challenge. And I think if I look at the board, I would say that's one of the significant hurdles that the plaintiffs face on this appeal in the sense that they are saying or acknowledging the board was procedurally robust, but not substantively robust. That's their those are their words that appear in their briefs. And if you look at Jones, Jones v. Harris, they say 36B has two elements, process and substance. The process is the board. Did they have a good process? The substance is the fee. And what plaintiffs are doing is they're conflating the two and saying, well, I don't like the result. They should have. They should have. The fees are still the same. They should have gotten fee reductions earlier. I think one of the points that they make is that when you look at the testimony of the I think it's the 15C process that the board never considered the Gartenberg factors. And I think the plaintiffs point to that as being how it was substantively deficient. That's absolutely incorrect, Your Honor. The plaintiffs are absolutely incorrect. The judge's findings clearly say that the judge considered each of the Gartenberg factors and a fund governance expert testified that they received information on each of the Gartenberg factors and that they were sufficient for them to form an opinion as to the fees. And the board repeatedly testified throughout trial. Again, plaintiffs were trying to lock them in to saying which factor was the most important. And they said, look, we looked at all of the information, all of the factors, and that evidence is citing the proposed findings. They absolutely considered all of the relevant factors. And just to pick up on the chief judge's point, he asked my friend, what was the breakdown in the process? And my friend said they didn't consider the growth of the assets. The board absolutely had the asset levels every year. He said they didn't consider the growth and profitability. They were given the profit margins every year and over time, as I said, showing five year snapshots of how they've changed. And they didn't get fee comparisons, which they absolutely got. So what the breakdown in the process is plaintiffs arguing they want this court and ask Judge Arguello to take the same exact information that the board was given and come to a different conclusion. The Supreme Court in Jones says 36B does not authorize a court to second guess a fully informed board. Their arguments on the board are asking you to do just that. And it's not proper under Jones. But plaintiffs face a number of other hurdles on this appeal. And that is that there are six factors. I mean, I certainly place great emphasis on the board, but, you know, whether you're talking about profitability or economies of scale, those are factual findings that are well supported in the record. You'd have to find clear error on a number of them and turn the dial on a number of factors. Many of them, I would say, if you don't change your mind on the board. And that's a real problem for them, even if you accept he's got some arguments on economies of scale. The other point I would make is there's not really any errors of law that are being identified here. My friend spoke about the judge's heavy reliance on competition and comparative fees. That's not a fair reading of the decision. You know, they cited Dr. Hubbard, who cited in a footnote talking about competition in a background section, a footnote in the background section of the opinion talking about the admissibility of that. That's not a heavy reliance on comparative fees or competition. She simply lists when she gets to her finding six factors, one of which is comparative fees. And there's no evidence she gave any heavy reliance or heightened reliance in any way. The other point I would make, Your Honor, in terms of the hurdles that plaintiffs face is the credibility finding with respect to their expert. Their expert was the principal advocate for their positions, including the exact same issues that they're arguing here on appeal for many of them. And the judge found that expert simply not credible. We would submit there's no basis to revisit those findings. A lot of the same points that were made by my friend in his argument talk about the increasing profitability and the economies of scale. Those were verbatim arguments that their expert made. And she found him not credible and not supported by the evidence. I mean, the judge. And that credibility finding would be under clearly erroneous standard, right? Correct. Yeah. I mean, yeah, we would submit yes. And obviously, there's a lot of case law that suggests that credibility findings in particular should be given deference on an appeals court, particularly here where we had an 11 day trial with 16 witnesses and the judge thoughtfully and carefully considered all of the evidence. If we lose the if we were to affirm with respect to the expert, is there any other evidence on damages than what he had to say? I would submit no, Your Honor. I mean, if you read the judge's opinion when she starts off, she says it's almost an argument that the plaintiff's only evidence on damages was their expert, Chris Meyer. I agree with that. Their damages was put in through their expert. He was found not credible. And maybe I should just turn to damages quickly. I mean, 36B, the statute required that it's an independent ground for affirmance. You could take everything else that we've been discussing about liability and take it as an independent ground for affirmation. But if you're going to say, you know, they're going to lose or you should affirm on that ground as well. Again, credibility, I think, would be enough. But the theory of damages is also legally flawed. Plaintiff's expert's opinion was that any portion of the fee that was above average constituted actual damages. I would note that the average that they're using, my friend likes to say our fees are above average. There were many, many sources of data, Morningstar, Lipper, JDL, that said the fees were below average. And the judge found the above average data set that plaintiffs were using was an inapt comparison under Jones. So it's factually flawed. But legally, that can't be the standard for actual damages under the Supreme Court's decision in Jones. What is the standard, in your view, then? I mean, it's a great question. No court has ever had to decide that because no plaintiff has ever won. And I would not want to sit as a judge on a case where I had to decide where the outer bounds, it's clearly the what is the outer bounds of arm's length bargaining. I think I can say that. But I think if you read Jones, what the Supreme Court's saying is judges are not well suited to determine that. And therefore, we're going to defer to the board if they've got a lot of information, because it's hard to pick a point where it is. What I can tell you is that what plaintiffs have put forward, which is an average fee of an imperfect data set, cannot be it. As a policy matter, half of all fees would be excessive. And that would be regardless of how competitive an industry was or how low priced an industry was, excessive. And I would, in closing, I see I'm out of time. I would just say plaintiffs concede that their damages model is is wrong in their briefs when they keep saying it's reasonable fees. They admit that their damages are on what they think is reasonable. That's the exact standard that was rejected in Jones, noting that Congress rejected it when they enacted the statute. Thank you, Your Honor. Counsel, thank you. Your time's expired. You're excused and will take the case under submission. Thank you for your participation today. Thank you. Do I start, Your Honor, without you calling the case? My panel's still preparing. I'm sorry. I know you're chomping at the bits. OK, I think we appear to be ready to roll. Let's move from mutual funds to bankruptcy. 20-1376, Rodriguez versus Barrera. Mr. Wadsworth, you're for the appellant. You may proceed. Thank you, Your Honor. May it please the court, my name is Dave Wadsworth. I am the attorney for the Chapter 7 trustee in the underlying case, Simon Rodriguez. Today's appeal presents a single issue of statutory construction, which is given de novo review. The statute in question is Section 348 F1A of the Bankruptcy Code, which defines what property of the Chapter 7 bankruptcy estate consists of when a case converts from Chapter 13 to Chapter 7. And the salient language is, property of the converted estate, quote, shall consist of property of the estate, comma, as of the date of filing of the petition, comma, that remains in the possession of or is under the control of the debtor on the date of conversion. And there are two phrases in there that I think got all the attention in the bankruptcy court and in the BAP, and that's the phrase, property of the estate, and the phrase, as of the date of filing of the petition. It's our position that neither one of those phrases has any ambiguous language. There's no word in there that is not subject to widespread understanding as this court has phrased plain or unambiguous language in the McCow or McCuff case that's cited in the briefs. And so, there's no reason to go beyond the plain language in interpreting it. The phrase, property of the estate, is a defined term in the Bankruptcy Code. It is Section 541 of the Bankruptcy Code. That section is titled, property of the estate, and subsection A defines what that consists of. And I think the bankruptcy court, the BAP, Judge Romero, and the Hayes case, everyone agrees that the phrase, property of the estate, in this statute, 348 F1A, is the same as 541. There's no distinction there. It is exactly what that statute says. And 541A is incredibly broad. It has been defined, or it has been interpreted by the Supreme Court in multiple cases. We cite just two in the brief that we think add some help to the interpretation here, the Rousey case and the Schwab case. Both of those cases talk about property of the estate being, well, I mean, so the plain, the language of the statute says it's all legal and equitable interests of the debtor on the date the case is filed. The Rousey and the Schwab case both talk about the statute means what it says. What comes into the estate is the property. And then you can later take pieces out. You can then make value decisions and carve pieces out for exemptions and so forth. But what comes into the estate is the property itself. All rights, all interests, everything that it comes with. And I think that... Yeah, we're talking about then kind of what happens after the petition is filed. And there's a broader principle here. I think the facts are quite clear as you've stipulated to here. But what happens to appreciate aitable assets that exist on day one? You used a stock example in your briefs. We have an appreciated home. It could be jewelry, you know, countless other assets. And I think your position would be that any appreciation in any asset would be property of the estate that would be distributable by the trustee at conversion. Is that right? If the property interest existed on the date the case was filed, 100%, totally agree, Your Honor. And the negative applies as well. If the property went down in value, the Chapter 7 estate would suffer that as well. It is the asset with all attributes that is a property of the estate. Yeah, so and then I assume there's a schedule at the filing of the petition of all these, of the diamond rings and the Microsoft stock and the house on Mulberry Street, et cetera, right? Now, in this case, the debtor sold the home before the conversion. And all those other examples, appreciated stock or appreciated jewelry, depreciated stock, all those could be sold before conversion. What do, is the trustee entitled to what those sold for before conversion? Or do we go back to the filing date? I think that you go to what is in the debtor's possession on the conversion date. That's the reasonable interpretation of 541A1 and A6. A1 is the property, A6 is the proceeds. And so if the debtor sells the property during the 13, and let's say, you know, generates $100,000, if he still has $100,000 when the case converts, then that's what comes into the, to the Chapter 7 estate, because that's what's in his possession. If he spends 50, then only 50 comes into the Chapter 7 estate. It's dictated by what he remains in possession of. Well, so the proceeds from the house and the bank you get under your theory, but the debtor buys a boat or maybe a new house with the proceeds, you know, another valuable asset. Are those off limits because they've been, you know, somehow transformed into different assets? Or can you claw back and make the debtor sell the boat or sell the ring or sell the vacation home? So I think, I mean, those are facts that aren't present in this case. No, but they're implicated by whatever rule you want us to adopt. Well, sort of. All I'm asking is that this actually be interpreted or applied exactly as it says. But, so what I would say to the question, Your Honor, is that absent a finding of bad faith, right? So if somebody, in converting this asset into a boat, if there were some indicia of bad faith, that would be a separate issue. But if there's no indicia of bad faith, then I would, I mean, in the plain language, again, it's no, the proceeds are no longer in the debtor's possession. The debtor has a pretty good argument there. That's not something the Chapter 7 trustee can, can recover. Well, I know this isn't your case, but is that, I'm a debtor. I did the 13, trying to make it work, couldn't make it work. I know I'm, I'm heading into seven land. So I take, I take my stuff and I sell it. And, you know, I, that's, that's my only avenue to preserve, you know, cash somehow. I'm, you know, maybe your theory is that that's bad faith. Although if it's permitted by the plain language of the statute, I'm not sure why that would be a credible bad faith argument because they weren't really hiding anything from the trustee or from the creditors. So I think my response to that, Your Honor, would be, and this kind of gets into the bankruptcy court's policy analysis, which we, which we disagree with. In this case, and you can look at the, at the plan, which was, it's on, it's in the appendix. And I think it's a page 80 is, is the one I'm specifically referring to. In this case, the debtor proposed to pay 241, or the debtors, $241 a month for the first couple of years of the plan. And then $263 for the last three years. So this case was converted, I think three years into the plan. So they would have been at the 263 a month period. If they sold that house and they generated $150,000, you can't tell me that they couldn't have set aside $6,000 of that money to complete their plan payments. And then, and then fulfill the bargain that they struck with all their creditors and the bankruptcy court in the plan that they filed under penalty of perjury, you know, and gotten their discharge. And, and that would have solved all of this. So this idea that somehow there's a disincentive to the chapter 13, when, when what happens is, is happening in this case is, I think it's a false premise. I mean, there's this asset. They could, they could easily have continued making the payments under the plan and never had this issue arise. Yeah, but, but, but that's not why we're here. You know, we're in, we have to come up with a, an interpretation of the scheme that applies to countless, countless variations. And I'm just trying to figure out what the, what your limiting principle is here. And, you know, how we can, how we can come up with a consistent theory that, that conscientiously applies the statutory scheme to countless other, other fact patterns. Well, so my response to that, Your Honor, I think, I mean, I think the 348 F1A answers the question. I mean, what, what does the debtor have in his or her possession on the date of conversion? And if that thing, whether it's cash or it's physical property, was something that was scheduled in the initial Chapter 7 case, then that comes into the Chapter 7 estate, period. I mean, I don't. And what, what's your, your theory? I think I understand from the briefs, but your theory on what work F2 does, you know, the other side is set up too. And I think the bankruptcy judges also said that that would, you know, lose any work under the theory of the case that you're advocating. Yeah, I don't understand the argument, Your Honor, because that too, I mean, we're not, we are not advocating that after acquired property comes into the Chapter 7 estate. And, and so any wages earned after the bankruptcy filing, those are not going to come into the bankruptcy estate or any property. This would, this would get into your boat example. I mean, I guess, I guess that is a possible loophole here where a debtor could convert Chapter 7 property or property of the estate into another asset. And then, and then argue it's after acquired and then therefore it doesn't come into the 7 estate. I think that's possible. What about an inheritance? That also is governed by 541. If it is, if it is received more than six months after the initial filing, it's after acquired property, wouldn't come into the 7 estate. If it's acquired within six months of the bankruptcy filing, it is property of the 7 estate that would come in. That really seems like a pretty big loophole. You know, this conversion of proceeds from an asset to another asset. But if, well, I suppose that's possible, Your Honor. But I think we, again, we then get into, I mean, I think that, I guess I wouldn't give this bad faith argument such short shrift because if somebody, on my example in this case, where a debtor has $6,000 that he easily could have set aside to make payments, I think he could make a credible argument that somebody who is attempting to avoid the application of the bankruptcy code to keep, you know, to buy a yacht to avoid paying his creditors. I think you might be able to. That's exactly what I would do now. Well, but I think you're making a bad faith argument there on that, that they had the ability to make these payments. They didn't need to convert. And so this really was designed to thwart the trustee. But even beyond all that, Your Honor, I guess I would, I go back to this court's Miller decision, which I think the appellee cited and the BAF cited, and it goes into a lengthy discussion of when you look at legislative history. And this is not that case. This is not a case where you look outside of the language of the statute to policy because there's no, it doesn't admit of any other meaning without adding language. And Miller says, and all other cases say, it's not the role of the judiciary to write statutes. It is to interpret what Congress said. If Congress didn't enact what they meant to enact, that's Congress's problem, not the court's. And so, I mean, I still have, I'm hung up on the idea of the possibility here of finding any ambiguity in the plain language, right? I mean, there's no phrase in that in 348 F1A that does not mean what it says. And so, whether there's a loophole or not, that's something that Congress can deal with at a later date, or it could be dealt with in a bad face, or it could be a loophole that ends up happening. But I mean, I don't think that's the role of, in this appeal, that is something implicated that should be influencing the result. Well, but don't Judge, Chief Judge Tempovich's hypotheticals suggest, we have to look at the broad working of the statute, and don't they suggest that your interpretation, in some ways, well, maybe not absurd, but approaches align to being absurd, because then, in this situation, the only thing that would, the debtor could have easily gone out and bought something. And then, and they just, it would just be the happenstance that at the time they converted, they had not purchased the yacht that allowed you to get access to money. Why does that make any sense? I mean, the notion that you have $100,000 in your pocket, and you kept the cash, as opposed to converting the cash to an asset, and at least, if I was understanding you correctly, the argument would be the trustee could not go after the yacht, but could go after the $100,000 in cash. What's the difference? I think, ultimately, Your Honor, the difference there is that there's something about the scenario that you and Judge Simcovich have set up that is, that smacks of bad faith. I mean, that does sound like you are, you have something there, you've made a bargain with your creditors, they're gonna pay a certain amount of money, you have the ability to pay it, and instead of paying it, you're gonna convert an asset into a yacht, and then walk away and leave your creditors high and dry. I mean, that smacks of bad faith to me. I would have thought the answer to my earlier question would be that you could claw back the yacht, and distribute the proceeds to the creditors, because whether it's cash, or yacht, or anything else, it all flows from the initial property of the estate, but that's not your position. Well, I think that, I mean, that gets into different facts. I mean, I think that gets into the reinvestment argument, Your Honor. If the property hadn't reinvested, there may be a 549 post-petition avoidable transfer claim there for the trustee, but if the property's reinvested in the debtor under the plan, I'm not sure that same claim. But typically, under bankruptcy, when you're looking at property of the estate, it would be limited to proceeds, and not then continue to trace it into further property. Is that right? So when you sell the house, and if you have the 100,000, that's proceeds, so it falls under 541. Right. If you take that 100,000, and using the hypothetical, you go buy the yacht, the typical interpretation of 541 would not further treat that as proceeds. Am I right? Yes, but I think that's a, I'm not sure that's a fair hypothetical, because if we're in Chapter 7, for example, and I think this speaks to my last response to Mr. Trustee's 10th Committee's question, if you're in Chapter 7 and the debtor transfers property of the estate without authorization, turns it into a yacht, sells the house without authorization, turns it into a yacht, you would have a 549 claim against the yacht. Similarly, in the 13 context, you would, I believe, if the property hadn't re-vested and the case re-converted. So it's sort of a different issue. I think you still have a claim if that asset was property of the estate when it was wrongfully taken out and turned into something else. Okay, so that may go to whether this interpretation is absurd, because there's another way to deal with it in the code. Is that what you're arguing? I'm not arguing that. I was simply answering what I thought was a question. I'm not, I don't, I mean, I don't see how saying, how applying the statute exactly as it's written reaches an absurd result when it results in a better result for creditors. I don't see how that's possibly be so absurd. I apologize, I'm over my time. No, that's okay, and then just be clear, there's the devaluation of an asset, the depreciation of the house or the stock or the jewelry, the trustee bears the risk and the burden of that. Absolutely, I mean, the property is the property. It's whether it goes up or down, that's what comes into the estate. Okay, all right, I think we follow that. Let's hear from the appellee, Mr. Asbach. Thank you, Your Honor, and may it please the court, just following up for the, for the, Please introduce yourself for the record. Oh, I'm sorry. My name is Eric Asbach. I represent the debtors in this case, Julio Cesar Barrera and Maria de la Luz Moro, who are also the appellees. Just to follow up on the comments, I've heard from the court that the court would like to find a very simple solution that it can apply to many different kinds of assets. And I'd like to caution the court that the Bankruptcy Code and Colorado State Exemption Laws, as well as probably the State Exemption Laws of all other states, treat a debtor's home in a very special way. And particularly in the case of a conversion of a case from Chapter 13 to Chapter 7. So I don't believe that the court's approach of trying to find a one-fits-all solution is going to work. I think you can find a one-fits-all solution regarding post-petition appreciation a debtor's home, but that's going to be different than the treatment of other assets for reasons which I will go into. Well, you know, if Congress treats them all the same, then don't we have to do what Congress says? I mean, there's nothing in this section on the effect of conversion that sets out a different rule for the debtor's home than it does for any other property of the state. I agree that the court has to do what Congress wants the court to do. And that is why the court should give great deference to Congress's explicitly stated intent in the legislative history to 348 F1A regarding post-petition pre-conversion appreciation a debtor's home. Well, can we part of the legislative history if we don't think the language is ambiguous? I mean, Congress may have intended to do one thing, but the words on the page may not be consistent with that. So this is what the 10th Circuit has stated in New Mexico versus Department of Interior 854 F3-1207. If Congress has spoken directly to the issue, that is the end of the matter. The court must give effect to Congress's unambiguously expressed intent. And that expressed intent is set forth in the legislative history to 348 F1A. And in that history, the court gives an example of a debtor paying off $10,000 of equity in his house and then converting it. And Congress stated explicitly that in such case that post-petition increase in equity should go to the debtor. So. What would you say your best argument is not relying on the house report? Your best textual argument? The best argument not relying on the house report? Your textual argument. Go ahead. Well, the other argument would be that the one would be the same argument that was discussed by Judge Brown, which is that there's a difference between the proceeds and the house itself. And Judge Brown made the point that we're discussing Judge Romero's decision in the Hayes case. Judge Brown pointed out that according to Judge Romero, the proceeds were different, but the property is not different. So on one hand, Judge Romero said, well, the house is the property and that's the end of the story. But then he also goes on to say, well, we also have the proceeds and it's kind of the same thing, but we have to go to this other statute. That would be the other argument. I'm not following that argument. You have to go to the other statute. What other statute? I believe it's 541-86. Okay, so you're saying that the use of the term property of the estate should be defined by going to 541, which is, in fact, the definition of property of the estate. Let's see that that helps you. And A6 is proceeds, right? Yeah, A6 is the proceeds. And so Judge Brown's critique of Judge Romero's decision was that the property is one thing, but then he also has to go to 541-86 to get the proceeds in. So it's actually two separate things. But they're both property of the estate, right? Well, not according to Judge Brown. I'd have to go back. Judge Brown raises the issue that it may not be property of the estate. But I'd like to, if I, can I make, is it okay if the court, if it would please the court, I'd like to make my arguments about the legislative history. Well, you can make your argument about legislative history, but we've got to make a determination here. And if we don't think legislative history applies, then we're going to have to know what the other answer is. Because it's not, you've got to establish ambiguity before you get to legislative history. And you can pick up that case again, but there are legion cases that I could find and cite to you that suggests that ambiguity is the gateway to legislative history. So I've got my cases. And so why don't you tell me if those cases are in fact going to prevail, why the statute is ambiguous? And if it is not ambiguous, then why you went? Okay. So let me go into this. I think the court should look at the legislative history for four reasons. Number one, Congress has explicitly addressed the issue at bar in the legislative history. And I cited the case about that. Number two, consulting the legislative history is never improper. Three, 11 U.S.C. 348-F. What case did you cite for that? Which one? It's never improper. Consulting legislative history is never improper. Well, improper maybe not, but premature, yes. Sure. So this is another quote from Judge Brown. Consulting the legislative history is never improper. The Supreme Court has noted repeatedly that when aid to construction of the meaning of words as used in a statute is available, there certainly can be no rule of law which forbids its use. Well, Mr. Asbeck, we're reviewing Judge Brown's decision, right? Yes, you are. Okay, so whether he says that or not is not the determined factor here, is it? So it's train versus call. If I may, I think your question was what's the case law. It's train v. Colorado Public Interest Research Group. And that quote is appellant appendix at 228. Mr. Asbeck, can I ask a question? Yes. If your client instead had not sold the home, had held onto it and converted, what would the trustee or what would the bankruptcy estate get in that case? If the client had sold the home, the trustee would get nothing. Had not sold the home. Yeah, if the house had not been sold, the analysis would be the same. So even if they still had the house when they converted to liquidation proceeding, the trustee would have no interest in the house, in the value of the house? No. No. Correct. And why is that? I don't understand that. When the case was filed, the equity in the house was less than the homestead exemption. Okay, so look- And if I can finish answering the question, and then after the case was filed, the trustee is not entitled to the post-petition appreciation in the house. And what do you rely on that the trustee's not entitled to post-petition appreciation? The legislative history, the 348-F, and if I can go back to- Okay, other than legislative history, do you have either case law or an interpretation of the statute that supports that? Yeah, I have many case law. I have a great deal of case law set forth in our briefs, Section D, starting at page 11. We've got nine cases going back to the year 2000. Let me ask you this. In the statute, Section 348, in Section F.B., it talks about valuations. And it says that the valuation of property shall apply in a converted case under Chapters 11 and 12, but the valuation in a Chapter 13 does not apply in Chapter 7. To me, by saying that, they're saying the valuation during the reorganization case is not fixed. That section, to me, seems inconsistent with the idea that you can rely on how the house was valued at the time that the Chapter 13 was filed. What do we do with that section in terms of changing valuation? Well, what we do with that section is we look at the established, the approach that Judge Brown took is we look at the valuation of the house at the time the case was filed. And that's how much the house was worth when the case was filed. So we have one issue. Isn't that directly contrary to what I just read from Subsection B? It says that the valuation, you do look to the valuation of when you filed the Chapter 13 in a Chapter 11 or 12 conversion, but not in a Chapter 7 conversion. I mean, if that were different, I think you'd have a pretty good argument if that were the other way around, is that that section says valuations remain fixed, but I don't think that's what it says. Well, I disagree, but in this case, you look at the value of the house when the case was filed, and 348, the statute that you're referring to does not apply in this case because the trustee is not entitled to the post-petition appreciation. And if I can get back to, I've only got three minutes left here. Well, post-petition, that whether the trustee's entitled to post-petition appreciation is what we're here to decide, isn't it? Yes, yes, Sean, it is. And going back to your question, Judge Holmes, about why is 348F ambiguous? Let's start off with this. We have two bankruptcy judges who've come to differing opinions about what the meaning of 348F1A is, okay? Judge Brown said, in our case, that it means that the trustee is not entitled to the post-petition appreciation. Judge Romero, on the other hand, found that the trustee is entitled to the post-petition appreciation. So in Colorado, I'm sorry, in the 10th Circuit, statutory language is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more different senses. And I think the Bankruptcy Appellate Panel rightfully found that there could be no better example of a statute which is interpreted in two different senses than these two opposing opinions of Judge Brown and Judge Romero. If I disagree with you that there's something unique about the personal residence here, the Homestead exemption, and I look at other assets of the debtor and the stock that was worth $100, that filing is worth $1,000 at conversion, does the trustee get the $1,000 or the $100 if those are sold? The stock? Yeah. I would argue the trustee gets the value when the case was filed. Judge, so the appreciation would go... Judge, again, let me point out something that I think the 10th Circuit may not be familiar with. In a Chapter 7 case, if the debtor has a house and a Chapter 7 case is filed, and let's say the house, there's less equity than the Homestead exemption. At that point, the debtor can file a motion to abandon the house from the estate, okay? And so that cuts off, if that motion is granted, the trustee cannot recover the appreciation and the value of the house. That's what would normally happen in a Chapter 7 case is the debtor takes that house out of the estate because it's of no value to the state. In this case, that was not an option for the debtor because the debtor started in a Chapter 13. The house appreciated for three years and then it was converted. So the trustee's approach is an end run around the possibility, is an end run around the fact that he couldn't recover the appreciation of the house in a case normally filed as a Chapter 7. So it's the worst of both worlds for the debtor. It's the best of both worlds for the trustee in this case. Are you saying you'd have to file a motion to abandon in every 13? Well, yeah, that's not really done. Motions to abandon are really not filing the 13 because the property revests with the debtor. When the Chapter 13 plan is confirmed, that property revests with the debtor. There's no reason to file a motion to abandon, okay, as there would be in a Chapter 7. And just briefly, I've gone over my time here. Go ahead. The legislative history, the 341 F1A, clearly states that Congress does not want to disincentivize debtors from filing Chapter 13 for fear of losing their houses. That's explicitly stated. So we have a very explicitly stated public policy goal of not disincentivizing people from filing 13. And I can think of a few things that would be more disincentivizing to people from filing a 13 and the prospect of losing their house in the event that the 13 does not work out. And just bear in mind that 13s can be converted voluntarily or involuntarily. So you could have someone in a Chapter 13 who loses their house under the trustee's approach because it's involuntarily converted to a Chapter 7. So when the court talks about wanting to find an umbrella approach to assets, please bear that in mind as well. All right, counsel. We appreciate the arguments. Your time has expired. Very interesting and difficult case in my perspective. So we'll take it under advisement and you are excused. Thank you, Your Honor.